Good morning, Your Honors. May it please the Court, Scott Meisler, on behalf of the United States, I'll try to reserve three minutes for rebuttal. When Congress passed the Immigration and Nationality Act, it repealed three prior laws governing illegal reentry and replaced them with a single statute that prescribed a uniform penalty, provided a new basis for criminal liability, and established exceptions to that liability. That statute, as enacted in 1952 and amended since, is constitutional under equal protection principles. The District Court, in this case, is the only one in the country to conclude otherwise. This Court should reverse that decision. To do so, we think this Court can follow the path recently charted by the Fifth Circuit by upholding the statute's constitutionality without resolving whether the governing test is the rational basis standard or the Arlington Heights standard. And so, with the limited time we have today, I was planning to turn straight to Arlington Heights and to try to explain what we see as the legal and factual errors the District Court committed here that require reversal even under a clear error review. Now, I think, Your Honor, that Arlington Heights, as the Court knows, has a two-step process. The first is to identify the challenge decision, and the challenger bears the burden of showing that that decision was motivated, at least in part, by discriminatory intent. So the challenge decision here, as we understand it, is the 1952 enactment of the Immigration Nationality Act of 1326, not the 1929 Act. Was the District Court permitted to consider as historical background any discrimination preceding the 29 Act? Yes, but as the Court established in Abbott in Regents, and in McCleskey v. Kemp, that 23-year-old history involving a legislature that had turned over by more than 90% was entitled to little probative value. That's the language the Court used in McCleskey. And so we think here the District Court committed a threshold error by focusing on the 29 Act and then, critically, and this is a legal error under Abbott, putting the burden on the government to show that the Congress, in 1952, had cleansed the taint of the prior discrimination. Mr. Massa, may I ask you a question? Maybe you can refresh my recollection on this. The 1929 Act had very strict nativist quotas for certain countries, right? Yes, Your Honor, it was the 1924 Act that was implemented in 29, I believe, yes. And one of the quotas was for Spain. It only had 100 persons per year were admitted to residence from Spain, right? I was very conscious of that because I was born in Spain. But there was a Western Hemisphere preference. And since my father was a Cuban, and I was born a Cuban, it was available to me. Now, didn't that Western Hemisphere preference also apply to Mexicans? It did, Your Honor. So if there was a nativist discrimination under the 1924 Act, right, it may have affected persons born in Spain, but not persons born in Mexico, isn't that correct? That's correct, Your Honor. I don't want to make the defense case for them. I think their submission from expert testimony and whatnot is that the 29 Act was a compromise between essentially a way to discriminate against Mexicans without withdrawing them from the Western, or without adding them to the Western Hemisphere quotas. Again, we view, because of the way this was litigated and concessions the government made below, we view the 29 Act essentially kind of out of this case, right? In our view, the question really is, if you assume that discriminatory intent motivated that act, what way, if any, can it get? And if we're looking at the 52 Act as the challenge to action, what does the government have to show at that point? Your position is that 1924 and 29 Acts are irrelevant. I'm hesitant to use the word irrelevant because I think Abbott and the Supreme Court recognizes them as potential historical background. What I think I want to say is, using the Court's language, they were entitled to little probative value, if any here, because of those two critical factors, the passage of time and the change in the composition of the legislature. Counsel, I just want to be sure. I think, I thought I understood this coming in, but this is not a change in your position from what you argued in the trial court, is it? It is not, Your Honor. Right. No. So you conceded that point and then moved on and just said it needs to be given little weight. Exactly. Yes. I think the Court did. I think we may have used the word is entitled to no weight, is irrelevant. We may have used some stronger language that the District Court quoted back at us, but I think the best way to view this, as we viewed it now, is to view the 1952 Act as the challenge congressional action. And then, if you're doing Arlington Heights, do your Arlington Heights analysis. Under Abbott, prior predecessor laws are part of the historical background to the extent they shed light on the intent of the enacting legislature. And again, I think under Regents and other cases I just mentioned, passage of time, substantial shift in the composition of the legislature, dilutes the value of that evidence, if it's entitled to any evidence. I think opposing counsel raises the argument that the 1952 Congress needed to disavow the 1929 Act expressly. So what's your response to that? There was no express disavowal. I agree there was no express disavowal. I think our position as a matter of law is no court has ever held that. That position is taken, I think, largely from a concurring opinion by Justice Sotomayor in Ramos v. Louisiana, but we're not aware of any authority in the district courts explicitly said no binding precedent requires this. This is a novel holding that I think, as Judge Burns recognized in the other case you have pending before you in Robert Gasparrios, I think poses real separation of powers problems, Your Honor. I don't know exactly how a Congress does that. And here, I would also submit that the record does not support any inference that Congress knew about this history. Congress, writ large, apart from the 30 or so individual legislatures that may have remained from 29 to 1952, the Court did find, with challenges, but the Court did find that Congress knew about the disparate impact of the 29 law, but the Court made no finding and we've seen no support in the record for any inference that Congress was aware of the animus that the district court found to underlie the 29 Act, that it was aware of these shameful, troublesome floor statements made by individual members of Congress, some of whom were dead or retired by time 52 rolled around. So again, we think that those are legal and factual errors, but to my mind, Your Honor, Abbott explicitly holds, even on clear error review, the Court can correct legal errors in allocating the burden of proof. And if you read the district court opinion, as we do, in particular pages 16 to 20 of the first factor it cited from the 1950s history was silence. Congress was, as Judge Ikuda mentioned, Congress was silent, it didn't respond, it didn't expiate the sins of the prior legislature. That I think repeats the error that was committed in Abbott and the Supreme Court reversed. So we think that's an easy way to resolve the case because that also, of course, gives the defendant the benefit of a standard I think is stricter than the one that we've advocated in this case and others. But I will mention just a couple of other ones here. Abbott can be read broadly as a bright line rule when you have a new law, successor law, that gets a fresh start, that gets a presumption of legislative good faith. The district court here seemed to think that Abbott required a substantial alteration between the prior law and the new one, and we've tried to meet that standard on its terms, Your Honor. So even if you, again, assume that in the defendant's favor, I ticked off at the beginning of my presentation a few factors that changed. We think the changes between 29 and 52 were substantive, and the district court itself said that, right? It said, well, Congress added the found-in clause to 1326. That's a new basis for prosecution that solves a venue problem. It has its own pattern instruction in this circuit. It's a different theory of liability for legal re-entry. So it's a significant change in the law, but the district court seemed to think, as I read the opinion, that the change in the law sufficient to validate a later law has to be one that makes a law more racially neutral, and we just don't think that's supported because if a law, of course, is neutral on its face, it's hard for a legislature to make it more racially neutral in the first instance. And the second instance, I think, the second example I would give is that the district court derived that from some out-of-circuit cases, most prominently the Second Circuit's decision in Hayden v. Patterson, which involved a felon disenfranchisement law, and the change in, the only change in the New York law that was issued in Hayden was one that made, that either left the decision whether to enact a felon disenfranchisement law to the legislature, so it was a permissive law, this is a constitutional provision, or one that said, you have to enact this law. It didn't tell the legislature what to enact. It says, you have to do one of these things. That's the only change. It didn't attack the substance of the law, it didn't make it more racially neutral. And that's the one the Second Circuit thought was consequential enough to put the focus on the later-in-time provision and require the challenger to come forward with evidence that that provision was animated by discriminatory intent. And so, Your Honor, the district court also, I think, walked through a number of factors. Some of them are covered in the Fifth Circuit's, analyzed in the Fifth Circuit's recent decision in Barsenas, which we submitted as a 28-J letter to this court. I'm not going to walk through them unless the court wants me to, but one thing I did want to address, especially because it was raised in the reply brief in the Rodriguez-Barrios case also pending here, is the 1950 Senate report. The Senate, in advance of the Immigration Nationality Act, issued a 925-page report that studied comprehensively the immigration system, and we relied on that report to show that Congress went through a deliberative process here and was careful in what it did. And I think the defense has come back and pointed to some very uncomfortable language that shows racial consciousness. But I wanted to just make sure the court was aware that some of those quotations, I think, are taken substantially out of context, and I point the court, in particular, to the Calvillo-Diaz decision that's cited in our reply brief from the Northern District of Illinois, and the court walks through there and walks through some of these quotations and says, if you look at these as they're quoted, these look really bad, look very, very bad. But a couple things are important. Some of them go to the issue that Judge Bayer raised. Some of those go to whether we're going to extend the Western Hemisphere quotas to Mexico. And they're basically a pro and con of should we, should we not, presenting both sides, the nativist point of view and the more internationalist point of view. And the more internationalist point of view won out. So the district court, I think, in Calvillo-Diaz helpfully walks through and gives context to some of these race-conscious and, frankly, troublesome statements that were made on the record at the time. And again, no one can say that Congress wasn't thinking about issues of race and ethnicity and nationality. It was, after all, the Immigration and Nationality Act. And the big issue of the time was, do we extend, abolish, modify these national origin quotas that had been in place since the 1920s and had defined modern immigration law? So I think it's just important, Your Honor, for the court to be aware that, although some of these statements are troublesome and take out of context and especially appear to be so, we don't think that, when they're given the proper context, they're actually that troublesome. And the last thing I'll say, Your Honor, is just that I've been focusing on step one of Arlington Heights. We think the district court committed two legal errors I'll mention just very quickly at step two. If the court reached that for some reason, I should mention that some district courts have started to look, jump straight to step two, basically said, we can assume the no rational basis and we can assume you've shown some discriminatory intent, we can still resolve this because the historical record makes clear that this law would have been enacted even with, even absent a permissible animus. And so the two errors, just to mention them quickly, Your Honor, are that the court entirely discounted this court's case law, including Hernandez-Guerrero, about the legitimate deterrent interests served by this law. That's not a rational basis standard because that's what actually motivated Congress in 1929 to pass this. That's evident from the committee reports. So I think under the case that we've cited in our reply brief, the legitimacy and strength of the government interest is something that can be considered at step two of Arlington Heights. And the second thing, again, goes back to Judge Ikuta's point, the court basically discounted the entirety of the amendments to the statute since the 1950s because they didn't show Congress grappling. That's not the purpose of the statute. Those statutes show that Congress was interested and supported a legal reentry, even in legislation that was devoid of any indication of animus. And that makes it more likely this legislation also would have passed. I'll reserve my time. Thank you. All right. We'll hear from the other side. Good morning. May it please the Court. My name is Erwin Chemerinsky and I represent the defendant, Peli Gustavus Carrillo Lopez. This case comes down to two questions. First, does the Arlington Heights framework for equal protection analysis apply when it's a criminal statute that's alleged to be racially discriminatory in the immigration context? And second, if the Arlington Heights framework applies, then did the district court commit clear error in finding intentional discrimination? As to the first question, Ninth Circuit precedent already resolves the issue and is binding on this Court. The Ninth Circuit on several occasions has said that when there is immigration law that's alleged to be racially discriminatory, the Arlington Heights framework is to be used. This Court said that, for example, in Regents, the University of California, this Department of Homeland Security, more recently in Ramos v. Wald, and even going back to its en banc decision in Abebe v. Mukasey. Additionally... Now, Mr. Chemerinsky, may I interrupt you for just a second? Of course. I want to make it clear what precisely your claim is. Are you claiming that the amount of prosecutions under the statute is racially discriminatory as compared to the amount of arrests? Or are you claiming that the whole statute is unconstitutional, in other words, facially unconstitutional? The latter, Your Honor. The latter. Okay, thank you. The district court found, and this goes to the second issue, under the Arlington Heights framework, there is intentional discrimination. It's important to remember that the district court here found intentional discrimination. In precedence of the Supreme Court, of this Court, in fact, the government concedes when there's a finding of intentional discrimination, appellate review is under a clearly erroneous standard. And thus, the issue is, did the district court commit clear error under Arlington Heights in finding intentional discrimination? Analysis has to start with the 1929 statute, because that was the basis for the 1952 reenactment, and it's the basis of the law that exists today. And it's telling that the government conceded the trial court, that the 1929 statute was motivated discriminatory intent sufficient to meet the Arlington Heights requirement. Therefore, the issue is, has Congress ever purged the taint of the 1929 statute? Contrary to what the government says, there is Supreme Court authority that says, if there was a discriminatory intent, it must be purged. I think it's implicit in the Court's decision in Hunter v. Underwood. If you look at Ramos v. Louisiana, specifically footnote 44, the majority opinion says this. And there's more elaboration in Ramos v. Louisiana in the concurring opinions of Justices Sudameric and Kavanaugh. I think the best elaboration of this is in a relatively recent opinion. It's in Espinoza v. Montana Department of Revenue. Justice Alito, in his concurring opinion, describes the steps that need to be taken in order to purge the taint. There is nothing in the legislative history, or the statute, or the 1952 law, or any subsequent reenactment that ever purges that taint. Indeed, if we were only here on the 1952 statute, as the district court found, there's overwhelming evidence of discriminatory intent. As the government acknowledged, you have to start there with the 1950 report, 86-141. And there, the expression that discriminatory intent is enormous. But I also want to point out, if you look at that Senate report, it makes clear that what it was recommending was continuing the 1929 version of the statute, the same exclusions. And if you want specific page references, if you look at page 442 of that 1950 report, you see that the goal of the 1929 statute was to maintain a racial purity in the United States. So many places in that 1950 report, there's use of a racial slur. There's so many places in that report where the Senate expresses the desire to continue race discrimination. But that's not the only evidence with regard to the 1952 statute. You also can look to the letter from an assistant attorney general, Peyton Ford, where again he used a racial slur and expressed racially discriminatory intent. You can look at President Truman's veto of it. You can look at the President's Commission on Regression and Nationalization from 1953. So instead of Congress purging the taint, as the Supreme Court required, Congress doubled down on the discriminatory intent for the 1929 statute. And nothing in any subsequent statute has purged the taint. The government says it's unclear what would be required here, but we can look to other examples where Congress recognized discriminatory taint and then purged it. Think for example of the Fair Sentencing Act, where Congress recognized the discriminatory intent with regard to crack cocaine sentencing. We even think of the 1965 immigration statute that recognized the discriminatory intent behind the quota system and with regard to civil immigration proceedings and changed that. But here, there wasn't the recognition of the discriminatory taint. If we don't agree that there was a need to disavow a taint, what other evidence is there of discriminatory purpose that you think is most persuasive? Well, I've identified several things that are discriminatory intent with regard to the 1950 report, the 1515 report. I've also pointed the letter from Peyton Ford. I've looked at President Truman's veto. I've looked to the President's Commission on Regression and Nationalization. Also the expert testimony in this case supports that. And in Arlington Heights, the Supreme Court said if there's a discriminatory pattern so other explanation, discriminatory intent can be inferred. You've got that here. The statistics that are presented on page 18 of our brief show that 99% of those who are prosecuted in the statute are Latino, even though 80% of those who are undocumented are Latino in the United States. Were those same statistics? Is there evidence in the record of those statistics around the time of the 1952 Act? Because most of the statistics I saw in the materials were more current than that were recent. Yes, though I think there's two different questions. One is, was the 1952 Act motivated by discriminatory intent? And the other is, can we show that overall these statutes have discriminatory intent and discriminatory intent? Well, in considering the discriminatory purpose, one thing you would say is they had, Congress had a discriminatory purpose if subsequent to the enactment, it had a disparate impact. And so I was wondering if there was evidence in the record of subsequent to the enactment, there was a disparate impact. Yes, Your Honor. I think if you look at that report, you'll see there's no doubt that Congress knew in the Senate report says that this statute was used almost exclusively against those of Mexican and Latin American descent. So you're saying in the 1950 report? Yes. Are there... The 1950 report. You're saying there were statistics in that? Well, certainly from reading the report, you have no doubt that the Senate knew exactly what the statute was about and doubled down on it, saying that its goal was to continue the 1929 objectives and those objectives were very explicitly racial. But the actual statistics are current, is that right? The statistics in our brief are current, but I think that if you read the 1950 report, there's no doubt that Congress knew exactly who this statute was applied against. The government relies on Abbott versus Perez to support its position, but Abbott was very different because in Abbott, the Texas legislature repealed the districting and adopted completely new districting. Here in 1952, Congress reenacted the 1929 statute. It didn't repeal the 1959 statute, and that makes it a very different situation. It modified the statute in certain particulars, correct? They did modify the statute, yes, Your Honor, but with regard to the illegal reentry provisions, it all is very similar to what it was in 1929, 1952, and reenactments ever since. 1929, you had to be arrested, and 1952, you didn't have to be arrested. That's correct, Your Honor. But that doesn't change either the intent or the impact of the statute. This was a criminal statute that had a racially discriminatory impact from the beginning, and in that sense, Arlington Heights is clearly the standard under this court's precedence. The government also wants to invoke a recent decision of the Fifth Circuit that came the other way, and it's quite important to note that that was based on a different record. In the Fifth Circuit case, so far as we know, the government didn't make the concession that it did here of intentional race discrimination. In the Fifth Circuit case, there weren't the expert witnesses that were present in this case, and Judge Kudos, to your point, that's additional evidence of discriminatory intent of the 1952 law. We don't know that in the Fifth Circuit case, there was the same detailed analysis of the historical record with the same emphasis on the Senate report that I mentioned, 1515. And so this court doesn't need to give any deference to another court. It was relying on a very different record. Ultimately, then, this case comes down to two questions, and as important as the case is, there's really just those two. First, in light of this being a criminal statute that's discriminatory on the basis of race, do you use Arlington Heights? And this court's precedence decides that. And second, was the district court clearly erroneous in finding intentional race discrimination? And based on the 1929 statute, the absence of any acknowledgment of taint, let alone purging the taint, the legislative history of the 1952 statute, and all that's followed since, it seems overwhelmingly clear that the district court certainly wasn't clearly erroneous. Thank you. Thank you. Do you have some time for rebuttal? Mr. Meisler, I'd like you to respond to Mr. Chemerinsky's suggestion that the clearly erroneous standard here requires us to affirm the district court. In other words, that this is a factual finding which the district court made, and under our longstanding Hinkson case, we have to find that the clear error in that, it would be illogical, implausible, or impossible to infer from the record that an error was made. Yes, Your Honor, we accept, as we think we have to under Brnovich and Abbott, that this is a factual finding reviewed for clear error. I think I tried to start out by saying earlier that Abbott also clarifies that errors of law, especially ones that affect the allocation of burden of proof, allow a court to reverse under clear error. That is what we think has happened here under the purge the taint rationale we've been discussing back and forth. I also want to make another practical point about clear error review. This court has other cases pending before it, including the Machique Chop case and Munoz de la O, cited in our reply brief, in which other district courts in this circuit have in the same or similar defense experts reached the opposite result. Those cases are coming to you on clear error, and I think the court should try to avoid a scenario in which it's basically saying, yeah, these are both reasonable. I don't think a federal statute can fall because one judge finds it's discriminatory. Everyone else says it's not. And then this court says both are permissible readings of the record. We think that the record does not support it. We've argued this case under the Hinkson standard, Your Honor, and said that legal errors are mistakes, many of which the defense doesn't defend. I'll just say very quickly, if I can, on purge the taint, Hunter reserved this question. Hunter v. Underwood, Mr. Chemerinsky's main authority, reserved this question. Are you saying that this – that Judge Dube committed – chose the wrong law or made an error of fact? Both. I think her framework was incorrect because she required the government to purge the taint or clear – or cleanse the taint of – that she perceived from the 1929 law in considering the 52 law. That's an error – it's an error of law. She made other erroneous findings of fact as well. And I think if you view the whole – the ultimate finding of fact, discriminatory intent, as this finding with subsidiary things in it, some of the subsidiary findings were clearly erroneous. Just to give Your Honor one example, to tie it back to Mr. Chemerinsky's presentation, the Peyton Ford letter. Judge Dube repeatedly said that the Deputy Attorney General Ford proposed the founding clause that made the statute more punitive, and that was the impetus for Congress to act. That's demonstrably untrue. It's quite clear from the record. If you look at the first sentence of the Ford letter, Ford was responding to a request for comment from Congress. Again, I don't think that's the biggest error made in this case, but it's the kind of thing that under Hinkson is illogical and plausible. And likewise, like I said, just refer the Court to the Machik Chop decision I mentioned from Judge Simon that's cited throughout the briefs here. He walks through almost all of the evidentiary pieces that Mr. Chemerinsky mentioned, the Ford letter, the Truman veto, things like that, and explains why those do not – cannot plausibly be read as supporting a finding of discriminatory intent. So we're comfortable under Hinkson that reversal is warranted, likewise, because of the legal errors in this case. Thank you. The case of United States v. Carrillo-Lopez is submitted, and we'll next hear argument in United States v. Ali al-Mazayan.
judges: BEA, IKUTA, CHRISTEN